No. 37,019

GLADYS L. GREEN, widow, and KENNETH EUGENE GREEN, a minor, by GLADYS L. GREEN, guardian, *Appellants;* LEOTA GREEN, LINDA SUE GREEN and BARBARA ANN GREEN, minors, by LEOTA GREEN, Guardian, *Appellees,* v. W. A. BURCH, Respondent, and BITUMINOUS CASUALTY CORPORATION, Insurance Carrier, *Appellant.*

(189 P. 2d 892)

Opinion filed February 24, 1948.

*Wayne Coulson,* of Wichita, argued the cause, and *Howard T. Fleeson, Homer V. Gooing, Paul R. Kitch, Manford Holly,* and *Dale M. Stucky,* all of Wichita, were with him on the brief for appellant Bituminous Casualty Corporation.

*K. W. Pringle,* of Wichita, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

BURCH, J.: A new question in Kansas is presented by this appeal. Stated succinctly, the question is: Can illegitimate children recover as dependents under our workmen's compensation act? A second question likewise develops in the case: Can illegitimate post-

humous children recover compensation as dependents of deceased workmen?

The district court allowed recovery of compensation to an illegitimate daughter who was born approximately two years before the workman's death, and to a second illegitimate daughter who was born about four months after his death. During the last several years of his lifetime, the workman and the mother of the children, although not lawfully married to each other, had maintained a home together and represented themselves to various parties as being husband and wife; the workman had recognized the two-year-old daughter as being their child and had told friends and relatives that he and the mother of the children were expecting another child. The case presents no controversy as to the sufficiency of evidence to establish such facts. The additional facts are not essential to decision and, therefore, need not be stated.

Perhaps it is prudent, for the purpose of precaution, to emphasize at this point that the questions presented are limited to whether illegitimate children can recover compensation under the provisions of the workmen's compensation act. The court in this case is not concerned with questions relative to whether illegitimate children should be regarded in the same category as legitimate children at common law, under other statutes, or in any other type of case. Our consideration is confined to the construction which should be given to the applicable provisions of our workmen's compensation act.

The dilemma which demands decision in this case develops from the definition of "dependents" in our statute (G. S. 1935, 44-508 [j]) which reads:

"'Dependents' means such members of the workman's family as were wholly or in part dependent upon the workman at the time of the accident. 'Members of a family,' for the purpose of this act, means *only legal* widow or husband, as the case may be, and *children;* or if no widow, husband, or children, then parents or grandparents; or if no parents or grandparents, then grandchildren; or if no grandchildren, then brothers and sisters. In the meaning of this section parents include step-parents, *children* include step-children, and grandchildren include step-grandchildren, and brothers and sisters include step-brothers and step-sisters, and *children* and parents include that relation by legal adoption." (Emphasis supplied.)

The appellant invokes the maxim *expressio unius est exclusio alterius* and calls our attention to the significant fact that the legislature has seen fit to provide that "dependents" includes not only children, but grandchildren, step-children and adopted children, but

that the legislature has not included illegitimate children in any portion of our statute. The appellant, therefore, asserts, with proper emphasis, that this court should not read into the statute the term "and illegitimate children" when the legislature has not seen fit to do so, and that specific definitions of a term in a statute, by implication, exclude all others (citing *Coffeyville v. Metcalf*, 134 Kan. 361, 5 P. 2d 807). The appellee insists, with justifiable accentuation, that this court should not read into the statute the words "only legal" before "children" because the legislature has seen fit to apply such a limitation exclusively to a widow or a husband and not to apply it to children.

The appellant also argues that the legislature, by its enactments, has shown itself familiar with the ordinary and legal meaning of the word "children" and that ordinarily such term does not include illegitimate children and that the legislature, as early as 1868, in enacting what is now G. S. 1935, 22-118, 22-121 and 22-122, recognized the distinction between children and illegitimate children by providing that illegitimate children should inherit only from their mother and not from their father unless they had been recognized by him as his children; that the statute under consideration, therefore, must be taken in the sense in which it was understood at the time it was enacted (citing *State, ex rel., v. Moore*, 154 Kan. 193, 117 P. 2d 598). Appellant further contends that there is no reason why a child taken into a family under an unperformed agreement to adopt should be entitled to less consideration than a step-child, but that the legislature included one and did not mention the other and that it is, therefore, incumbent upon this court to construe the statute within its own limits (citing *Ellis v. Coal Co.*, 100 Kan. 187, 163 Pac. 654).

Counsel for the appellant concede that illegitimate children may recover workmen's compensation as "members of a family" under many statutes which do not define or limit such a phrase and that illegitimate children may recover under workmen's compensation statutes which refer to other general classifications such as "actual dependents" or members of the deceased's "household." In such cases, under a theory which has been denominated the "family doctrine," it has been held frequently that illegitimate children are capable of acquiring the compensation benefits payable to members of such general or particular classes. For examples of cases to such effect, see *Piccinim v. Connecticut Light & Power Co.*, 93 Conn. 423,

106 A. 330; *Gritta's Case,* 236 Mass. 204, 127 N. E. 889; *Roberts v. Whaley,* 192 Mich. 133, 158 N. W. 209; *Portin v. Portin,* 149 Tenn. 530, 261 S. W. 362; *Utah Fuel Co. v. Ind. Com.,* 64 Utah 328, 230 Pac. 681; *Smrekar v. J. & L. Steel Corp., Appellant,* 137 Pa. Superior Ct. 183, 8 A. 2d 461. But the appellant vigorously avers that cases of the character above referred to are not applicable or controlling under compensation acts which are worded similar to our own. In support of such averment, appellant calls attention to our statute (G. S. 1935, 77-201) which provides that in the construction of statutes, words which "have acquired a peculiar and appropriate meaning in law, shall be construed according to such peculiar and appropriate meaning." In furtherance of their argument, they assert that the word "children" has acquired a peculiar and appropriate meaning and that the cases, texts and law dictionaries are practically unanimous in declaring that prima facie the word "children" in a statute means only legitimate children. Moreover, the appellant contends that the cases under the various workmen's compensation laws are in accord in holding that the word "children," as a description of beneficiaries, does not refer to or include illegitimate children of a workman under statutes similar to our own. To substantiate the contention, the appellant relies particularly upon *Lopo v. Union Pacific Coal Co.,* 53 Wyo. 143, 79 P. 2d 465; *Scott v. Independent Ice Co.,* 135 Md. 343, 109 A. 117; and *Hargrove v. Lloyds Casualty Co. of New York* (Tex. Civ. App.), 66 S. W. 2d 466. As additional authorities to such effect, the appellant cites *Murrell v. Industrial Com.,* 291 Ill. 334, 126 N. E. 189; *Harry Scott's Case,* 117 Me. 436, 104 A. 794; *Broadbent's Case,* 240 Mass. 449, 134 N. E. 632; *Bassier v. J. Connelly Construction Co.,* 227 Mich. 251, 198 N. W. 989; *Bell v. Terry & Tench Co.,* 177 App. Div. 123, 163 N. Y. S. 733; *Staker, Gdn., v. Indus. Comm.,* 127 O. S. 13, 186 N. E. 616; *Smrekar v. J. & L. Steel Corp., Appellant,* supra; *Coakley v. Tidewater Con. Corp., et al.,* 194 S. C. 284, 9 S. E. 2d 724; and *Sanders v. Fork Ridge Coal & Coke Co.,* 156 Tenn. 145, 299 S. W. 795.

Counsel for the appellee in this case calls our attention to the fact that Kansas has departed, to a limited extent, at least, from the rule which requires that ordinary words used in a statute should be given ordinary meaning and cites as authority therefor the statement written by our present Mr. Chief Justice Harvey in

*State, ex rel., v. Republic County Comm'rs,* 148 Kan. 376, 383, 82 P. 2d 84, which reads:

"While, generally speaking, ordinary words used in a statute should be given their ordinary meaning, the more fundamental rule is that 'in determining the legislative intent in enacting a statute the general purpose of the legislature as shown by the statute as a whole, is of primary importance. Words, phrases and figures used in the statute should be construed in harmony with that general purpose.' (*State, ex rel., v. Gleason,* 148 Kan. 1, 14, 79 P. 2d 911.)" (p. 383.)

The appellee also presents for consideration the contention that our involved statute may be considered as uncertain and ambiguous and that as a consequence resort may be had to the general or public policy of the state and that statutes should be construed, where possible, to harmonize with the general policy of the state (citing 59 C. J. 1013). The appellee insists that the public policy of the state of Kansas is firmly established to the effect that an illegitimate child has a right to rely on its father for support, and cites *Doughty v. Engler,* 112 Kan. 583, 211 Pac. 619, 30 A. L. R. 1065, which case was later reported and affirmed in the case of *Myers v. Anderson,* 145 Kan. 775, 67 P. 2d 542. The appellee also advances the reasoning that since the cases of *Doughty v. Engler* and *Myers v. Anderson, supra,* held in substance that illegitimate children can rely upon their fathers for support as a result of the public policy of the state, it should follow that the rule set forth in 17 C. J. 1220 should be applied. Such rule reads:

"Where the parents of illegitimate children are bound to educate and support them, it has been held that such children may recover for the wrongful death of their father."

The appellee places particular reliance upon the construction which was given by this court to the so-called "soldiers' compensation act" in the case of *Miller v. Miller,* 116 Kan. 726, 229 Pac. 361, 35 A. L. R. 787. In the last-cited case it was held that a son, who was the child of a bigamous marriage and therefore illegitimate, was within the statutory provisions granting soldiers' compensation benefits to minor children of veterans. In such case it was urged that in the absence of a specific provision to the effect that illegitimate children should share in the bounty of the state, the legislature necessarily intended that only children born in lawful wedlock should receive the compensation earned by the service of the veteran. In the Miller case, *supra,* this court clearly was passing upon the meaning which should be given to the term "children" in Kansas.

The involved statute provided that compensation should be paid for the use and benefit of the widow and minor "children," if any, and did not define the term "children." The opinion in the Miller case, *supra*, written by Mr. Chief Justice Johnston, reads:

"Who are the minor children to whom reference is made? Manifestly they are those for whose life the veteran is responsible and to whom he owes the obligation of maintenance. The statute makes no discrimination between legitimate and illegitimate minor children. It is an independent provision creating a new obligation of the veteran, recognizing his responsibility to support his minor children and applying the compensation awarded to that purpose. The theory on which compensation is payable to wife or minor children is his obligation and duty to support them. However, if there had been no statute creating a specific obligation the father would still be liable for the maintenance of his illegitimate child as well as one born in lawful wedlock. In *Doughty v. Engler*, 112 Kan. 583, 211 Pac. 619, the court, after discussing the early common-law rule that parents were under no obligation to support illegitimate children, determined that this rule was repugnant to present-day conceptions of social obligations, and so unadapted to our conditions, and so unsuitable to the needs of the people, that it cannot be regarded as a part of the law of this state. It was decided: .

" 'The father of an illegitimate child too young to care for itself is under a nonstatutory obligation to support it, which may be enforced in an action brought by it through its next friend.' (Syl. ¶ 1.)

"In the course of the opinion, holding that the obligation rested on the father to maintain illegitimate children as well as those that are legitimate, it was said:

" 'A sufficient reason for holding parents to be under a legal obligation, apart from any statute, to support their legitimate child while it is too young to care for itself, is that the liability ought to attach as a part of their responsibility for having brought it into being. If that reason is not found convincing, it would be useless to seek others. And it does not in the least depend for its force upon the fact that the parents were married to each other, but is equally persuasive where that is not the case. It was true when Puffendorf elaborated it and applied it to illegitimate children in 1672, and it is true now.' (p. 585.)

"In response to a suggestion that the bastardy act provided a method of enforcing the liability of a father to support his illegitimate child, it was held that the action of the legislature in passing that act did not evidence an intention to make it the exclusive remedy of enforcing the father's liability, but that 'the measure is one providing machinery for the enforcement of a duty already existing rather than one creating a new obligation.' (p. 586.)

"So here, the provision for the application of the compensation to the support of minor children must be regarded as the creation of a new obligation which is enforceable, unaffected by the existence of the bastardy act or of other and earlier provisions with reference to the maintenance of illegitimate children." (p. 729.)

Unquestionably, the case of *Miller v. Miller*, supra, and the cases

therein cited, are strong authority to the effect that under the general public policy of this state, illegitimate children should be considered in the same category as legitimate children. As a consequence, it cannot be correctly urged in Kansas that the use of the term "children" alone necessarily implies that illegitimate children cannot be considered in the same classification. And it should be borne in mind that the case of *Miller v. Miller,* supra, was decided by this court in October, 1924. The first definition of "dependents" in our compensation act appears in section 9 of chapter 218 of the Laws of 1911. It reads the same as the corresponding section now reads except that the word "legal" did not appear before the word "widow" in the original statute. The definition of the term "dependents" was not changed by the legislature in any respect germane to the present question when it was again enacted as a part of section 2 of chapter 226 of the Laws of 1917. Therefore, possibly it cannot be said correctly that the legislature was aware of the construction given to the term "children" when the original act and the 1917 amendments thereto were passed. But after the decision in *Miller v. Miller,* supra, the legislature, in 1927, specifically repealed all prior statutory provisions relating to workmen's compensation and passed an entirely new act, although it embodied many provisions which had appeared in prior statutes. At such time, however, the legislature had under advisement a related problem, similar in many aspects to the one now under consideration by this court. In connection therewith the 1927 legislature saw fit to limit the definition of "dependents" who could recover under the statute by inserting the word "legal" before the word "widow." It follows that the legislature may be presumed to have known in 1927 that the word "children" had been construed by this court to include illegitimate children, and that possessed of such knowledge, the legislature did not then see fit to limit further the meaning which should be given the term by providing that the word "children" should not be construed as including illegitimate children. The result which may rightfully prevail is that the legislature in 1927 assumed that this court would continue to construe the word "children" in Kansas to include illegitimate children. A contrary result does not clearly develop from the context of the act. Our statute (G. S. 1935, 44-508) reads, "In this act, unless the context *otherwise requires:* . . ." (Emphasis supplied.) There is nothing additional in the context of the entire workmen's compensation act which would *otherwise require* us to

hold that the word "children" was not intended to include illegitimate children. It is true that by giving the statute under consideration a strict construction as contrasted to a liberal construction, this court might conclude that the legislature intended that the word "children" should not include illegitimate children. But again, we must realize that when the legislature reënacted the workmen's compensation act in 1927, the members thereof undoubtedly knew that this court was committed to the rule of liberal construction in construing the provisions thereof.

The rule that the workmen's compensation act must be liberally construed to effectuate its purposes is almost as old as the act itself. (See *Roberts v. City of Ottawa*, 101 Kan. 228, 231, 165 Pac. 869, and for more recent cases applying the rule, see *Stanley v. United Iron Works Co.*, 160 Kan. 243, 254, 160 P. 2d 708.) A logical inquiry follows from the rule: What are the primary purposes of the compensation act?

In *McRoberts v. Zinc Co.*, 93 Kan. 364, 366, 144 Pac. 247, this court held:

". . . In the enactment of the compensation law the legislature recognized that the common-law remedies for injuries sustained in certain hazardous industries are inadequate, unscientific and unjust, and therefore a substitute was provided by which a more equitable adjustment of such loss could be made under a system which was intended largely to eliminate controversies and litigation and place the burden of accidental injuries incident to such employments upon the industries themselves, or rather upon the consumers of the products of such industries."

and also that:

". . . It was further determined that as to them [employers and employees] the remedy afforded by the law is substitutional rather than supplemental or cumulative, and therefore exclusive. (*Shade v. Cement Co.*, 92 Kan. 146, 139 Pac. 1193.)" (p. 367.)

In *Gray v. Sedgwick County*, 101 Kan. 195, 165 Pac. 867, the following will be found:

"The general scheme of this legislation has been to enable those engaged in operating hazardous industries to compensate workmen injured therein and add the cost to the price of the product, thus extending the burden to the consumer." (p. 196.)

In *Shrout v. Lewis*, 147 Kan. 592, 77 P. 2d 973, this court held:

". . . . In other words, it is the purpose of workmen's compensation acts to place the burden of compensation for accidents to employees upon the industry rather than upon the individual employer." (p. 594.)

And in *Matlock v. Hollis*, 153 Kan. 227, 232, 109 P. 2d 119, it was stated:

". . . The act is founded broadly upon considerations of public policy. Its purpose is to provide protection to workmen within the limits established by the act, and particularly in hazardous employments. *It follows that the necessity of effectuating the public policy which animates the act must always weigh heavily in determining doubtful issues arising under it.* To this end this court is committed in many decisions, unnecessary to review, to a liberal interpretation of the act in favor of the employee." (Emphasis supplied.)

It also has been held that since the compensation act is a substitute for the common law and not merely supplemental thereto, that theories upon which the common law developed are not helpful in determining the intent of the legislature in passing the act. The substitution theory is clearly developed by our statute (G. S. 1935, 44-544) wherein the common-law defenses of assumption of risk, the fellow-servant doctrine and contributory negligence were abolished. In Kansas, statutes in derogation of the common law must be "liberally construed to promote their object." (G. S. 1935, 77-109.) In seeking to place the burden of compensation upon industry rather than upon the individual employer, the legislature also was seeking to relieve society as a whole, at least in part, of the burden of supporting those injured or the dependents of those killed in industry. In furtherance of such a broad general policy, we think it should not be held that the legislature intended to cast the burden of supporting legitimate children upon industry but intended to leave the burden of supporting illegitimate children upon society as a whole. The obvious intention of the act was to secure workmen and their dependents against becoming objects of charity by allowing reasonable compensation for all such calamities as are incidental to employment. (See *Industrial Commission v. Aetna Co.*, 64 Colo. 480, 174 Pac. 589, 3 A. L. R. 1336, and 28 R. C. L. 714.) Horovitz on Workmen's Compensation plainly states:

"Unquestionably, compensation laws were enacted as a humanitarian measure, to create 'a new type of liability—liability without fault—to make the industry that was responsible for the injury bear a major part of the burdens resulting therefrom. It was a revolt from the old common law and the creation of a complete substitute therefor, and not a mere improvement therein. It meant to make liability dependent on a relationship to the job, in a liberal, humane fashion, with litigation reduced to a minimum." (p. 7.)

While this court has an abundance of sincere respect for the decisions of other states, cited in this opinion, wherein a result has been

reached which is contrary to our conclusion, nevertheless, we are of the opinion that the public policy of this state, the history of the legislation, the context of our statutes, our rule of liberal construction, and the general purposes sought to be accomplished by the workmen's compensation act in Kansas require us to conclude that illegitimate children can recover, in the circumstances of this case, as dependents under the provisions of our statutes.

The answer to the second question as to whether illegitimate posthumous children can recover remains to be determined. Since we have decided upon the facts presented in this case that illegitimate children can recover in the same manner as legitimate children, the second question is not difficult to decide, as it previously has received the consideration of the court. In the case of *Routh v. List & Weatherly Construction Co.*, 124 Kan. 222, 257 Pac. 721, the first paragraph of the syllabus reads:

"An unborn child at the time of the accident which resulted in the injury and later in the death of its father, a workman, is a dependent and entitled to death benefits under the workmen's compensation law of Kansas."

The opinion quoted, with approval, the following:

" 'Where the father of the unborn child of an unmarried woman publicly expressed his intention to marry the woman and four days prior to the marriage was killed, it was held that the child was entitled to an award for total dependency.' (1 Schneider on Workmen's Compensation Law, p. 961.)" (p. 225.)

The appellant cites to the contrary *Smrekar v. J. & L. Steel Corp., Appellant,* supra, and *Sanders v. Fork Ridge Coal & Coke Co.,* supra. In the Smrekar case the applicable Pennsylvania statute required dependents to be members of the "decedent's household" as distinguished from "members of the workman's family," as our statute reads. Moreover, it was stated in the Smrekar case, *supra,* that under the Pennsylvania act the word "child" referred to and included only one begotten in lawful wedlock (citing *Gierak, Appel., v. L. and W. B. Coal Co.,* 101 Pa. Superior Ct. 397). The Sanders case from Tennessee, *supra,* is not in point because the court therein stated that in order for an illegitimate child to enjoy the benefits of the compensation act under subsection 3 of section 30, it was necessary for the child to have come into being and have been actually supported by his father, the deceased employee. Our act does not contain such requirements. In addition, it may be noted that insofar as the general purposes of the act are concerned, little, if any, distinction can be drawn between the duty of industry to

support a child who is born before the child's father is killed and one who is born after the calamity occurs.

The judgment of the district court is affirmed.

BURCH, J. (dissenting): With regret, I realize that I cannot agree with what I have written in behalf of the majority of the members of the court. I am convinced that the Kansas legislature was always fully cognizant of a class of children designated as "illegitimate" and saw fit not to include them as dependents. How can any other conclusion be reached when the same legislature was so thoughtful that it specifically considered as possible dependents not only children, grandchildren, step-children, step-grandchildren and adopted children, but also legal wives and husbands, brothers, sisters, step-brothers, step-sisters and grandparents? There is little, if any, more reason justifying the allowance of compensation to illegitimate children than there is to illegitimate wives. The danger inherent in allowing illegitimate wives to claim compensation is also incident to permitting such wives to bring forth claims for compensation in behalf of children whom they may claim after a workman's death to be the progeny of the deceased workman. Moreover, on meditation, I become more and more certain that the legislature, when it reënacted the act in 1927, intended that the word "legal" should modify and limit "children" as well as "widow or husband," since the semicolon in the statute appears subsequent to the term "children." In addition, I am of the opinion that if the legislature intended to include illegitimate children under the statute, it would, in keeping within its demonstrated precaution, at least, have limited the class—as in most other acts—to illegitimates who were acknowledged, recognized or legitimatized before the injury. (See *Lopo v. Union Pacific Coal Co.,* 53 Wyo. 143, 79 P. 2d 465.) The construction of the statute reached by the majority of the court would eliminate such safeguards, were it not for the facts in this particular case, and allow illegitimate children to recover workmen's compensation benefits without qualification while all other illegitimate children in the state cannot recover as heirs of their fathers unless their fathers have notoriously or in writing recognized the paternity of the children. (See G. S. 1945 Supp., 59-501, and G. S. 1935, 22-122.) The legislature never intended such a distinction.

WEDELL, J. (concurring specially): The workmen's compensation

act, as we have repeatedly said, is a law unto itself. I, therefore, limit my views accordingly. This case presents the problem of interpreting a part of a statute quoted in the majority opinion. (G. S. 1935, 44-508.)

In my opinion the question is not free from difficulty. I resolve my doubts on the subject in favor of compensation for the child solely on the broad general ground the compensation act was intended to provide compensation for dependents of an injured workman. A legitimate child, unborn at the time of its father's injury, is a dependent. (*Routh v. List & Weatherly Construction Co.*, 124 Kan. 222, 257 Pac. 721, 62 A. L. R. 150.) An illegitimate child, so born, is no less dependent upon its father for support.